# UNITED STATES DISTRICT COURT
for the
Eastern District of Wisconsin

In the Matter of the Search of:

| | |
|---|---|
| THE CELLULAR TELEPHONE ASSIGNED CALL NUMBER (708) 982-6640 | )<br>)<br>)<br>)<br>)<br>)    Case No. _19-MJ-1250_ |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

<u>See</u> Attachment A

over which the Court has jurisdiction pursuant to Title 18, United States Code, Sections 2703 and 2711, there is now concealed:

<u>See</u> Attachment B

The basis for the search under Fed. R. Crim P. 41(c) is:
- ☒ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of: Title 21, United States Code, Sections 846 and 841(a)(1)

The application is based on these facts: <u>See</u> Affidavit in Support of Application for Search Warrant. To ensure technical compliance with 18 U.S.C. §§ 3121-3127, the requested warrant will also function as a pen register order. I thus certify that the information likely to be obtained is relevant to an ongoing criminal investigation being conducted by HSI. *See* 18 U.S.C. §§ 3122(b), 3123(b).

☒ Delayed notice of _180_ days (give exact ending date if more than 30 days: _12/04/19_ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Special Agent Jeremy Dorn, HSI
*Printed Name and Title*

Sworn to before me and signed in my presence:

Date: _6/4/19_

_____
*Judge's signature*

City and State: <u>Milwaukee, Wisconsin</u>

Honorable William E. Duffin, U.S. Magistrate Judge
*Printed Name and Title*

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, HSI Special Agent Jeremy Dorn, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the cellular telephone assigned call number (708) 982-6640, with listed subscriber NOE CONJURA (the "TARGET CELL PHONE"), whose service provider is T-Mobile USA, a wireless telephone service provider headquartered at 4 Sylvan Way, Parsippany, New Jersey 07054. The TARGET CELL PHONE is described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

2. Because this warrant seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), the requested warrant is designed to also comply with the Pen Register Act. *See* 18 U.S.C. §§ 3121-3127. The requested warrant therefore includes all the information required to be included in an order pursuant to that statute. *See* 18 U.S.C. § 3123(b)(1).

3. I am a Special Agent of the United States Department of Homeland Security, Homeland Security Investigations (HSI), assigned to the Resident Agent in Charge (RAC) Milwaukee, Wisconsin. I have been a federal law enforcement agent for over ten years. I have received basic criminal investigative training, including thirty-six weeks at the Federal Law Enforcement Training Center (FLETC). In the course of my work, I have become knowledgeable with the enforcement of federal laws pertaining to narcotics and dangerous drugs.

I have participated in drug trafficking investigations conducted by HSI, the Drug Enforcement Administration (DEA), Federal Bureau of Investigation (FBI), the United States Postal Service (USPS) and other law enforcement agencies, which resulted in the arrest of subjects, and the seizure of property, assets, and controlled substances. I am currently a member of the North Central High Intensity Drug Trafficking Area (HIDTA) Task Force assigned to the drug interdiction and opioid initiative as an investigator specializing in the smuggling, trafficking, and distribution of dangerous and controlled substances. I am familiar with various methods of smuggling and trafficking narcotics and other controlled substances and the proceeds from sale of such substances. I am also familiar with methods used to evade detection of both the controlled substances and the proceeds from their sale that are used by drug traffickers.

4.    The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. Throughout this affidavit, reference will be made to case agents or investigators. Case agents or investigators are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your Affiant has had regular contact regarding this investigation.

5.    Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, Sections 846 and 841(a)(1) (conspiracy to distribute cocaine and distribution of cocaine) have been committed, are being committed, or will be committed by Jose GONZALEZ-COLLADO, Eric ROSA and others. There is also probable cause to believe that the location information described in Attachment B will constitute evidence

2

of these criminal violations, and will lead to the identification of individuals who are engaged in the commission of these offenses.

6.     The Court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offenses being investigated; *see* 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

7.     The United States, including HSI and the DEA, is conducting a criminal investigation of Jose GONZALEZ-COLLADO, Eric ROSA and others regarding possible violations of Title 21, United States Code, Sections 846 and 841(a)(1) (conspiracy to distribute cocaine and distribution of cocaine).

8.     In September 2018, members of North Central High Intensity Drug Trafficking Area (HIDTA) DEA Group 63 and Group 68, along with members of DEA Group 62, initiated an investigation into individuals distributing large quantities of cocaine throughout Milwaukee, Wisconsin. HIDTA identified the individuals involved in this cocaine distribution as, among others, Jose GONZALEZ-COLADO and Eric ROSA. The investigation revealed that these individuals obtained the cocaine from an unknown source of supply in Puerto Rico.

9.     Based upon my training and experience, I know that a "controlled buy" (and/or controlled contact) is a law enforcement operation in which an informant purchases drugs from a target. The operation is conducted using surveillance, usually audio and video taping equipment, and pre-recorded purchase money. When an informant is used, he/she is searched for contraband, weapons, and money before the operation. The informant is also wired with a concealed body recorder and monitoring device. When the transaction is completed, the informant meets case

3

agents at a pre-determined meet location and gives the purchased drugs and the recording/monitoring equipment to the case agents. The informant is again searched for contraband, weapons, and money. Additionally, all telephone calls made by the informant while under the direction and control of case agents are recorded.

CS-1 Information

10.     On Friday, September 21, 2018, a confidential source (hereinafter CS-1) contacted Task Force Office (TFO) Kopatich.  CS-1 said he knew an individual named Eric ROSA who bragged about receiving regular cocaine shipments from Puerto Rico.   CS-1 said ROSA is Puerto Rican and has family that still lives on the island territory.  CS-1 said ROSA has offered to sell cocaine to CS-1 and that ROSA has sold cocaine to other individuals.  ROSA has bragged to CS-1 about receiving multiple-kilogram quantities of cocaine, which ROSA says he keeps in a storage unit near his residence on Milwaukee's south side.  ROSA's cocaine-dealing partner, an individual later identified as Jose GONZALEZ-COLLADO, is also known to CS-1.

CS-2 Information

11.     In October and November 2018, your Affiant and DEA TFO Todd Higgins spoke with another confidential source (hereinafter CS-2), who provided information that was reliable given that he/she made statements both against his/her penal interest and later corroborated by other information gathered during the course of the investigation.   CS-2 had known GONZALEZ-COLLADO for several months and, along with several of GONZALEZ-COLLADO's associates, shared an interest in working on automobiles.  Given the CS-2's close association with GONZALEZ-COLLADO and his associates, CS-2 became privy to the illicit activity in which they engaged.  Specifically, CS-2 said GONZALEZ-COLLADO supervised a drug-trafficking organization in the greater Milwaukee area.  According to CS-2, GONZALEZ-

4

COLLADO had cocaine sent, via U.S. Mail, from Puerto Rico to Milwaukee. On several occasions, in the past 6 months, GONZALEZ-COLLADO mentioned to CS-2 that GONZALEZ-COLLADO's drug source-of-supply resided in Puerto Rico (hereinafter the Puerto Rican drug source). GONZALEZ-COLLADO had numerous associates who agreed to receive the cocaine, which would be delivered to their home addresses in the Milwaukee area via the U.S. Postal Service. CS-2 admitted to receiving a parcel on behalf of GONZALEZ-COLLADO that CS-2 believed contained contraband. CS-2 said GONZALEZ-COLLADO may also have cocaine suppliers in New Jersey.

<u>Identifying the User of the TARGET CELL PHONE and Authorization for Location<br>Information</u>

12.     On December 28, 2018, a North Central HIDTA analyst had requested subscriber information for GONZALEZ-COLLADO from WE Energies. According to WE Energies, GONZALEZ-COLLADO had an account with the utility provider and listed his address as 1337A S. 21st St., Milwaukee, Wisconsin from April 17, 2018 through December 6, 2018. WE Energies further disclosed that GONZALEZ-COLLADO provided the telephone number 708-982-6640 (the number assigned the TARGET CELL PHONE) as his contact number. On December 18, 2018, GONZALEZ-COLLADO forwarded his WE Energies account from the 1337A S. 21st Street address to 6652 N. 43rd St., Milwaukee, Wisconsin. Despite the changed physical address, GONZALEZ-COLLADO maintained the TARGET CELL PHONE as his telephone contact with WE Energies.

13.     On January 21, 2019 and January 22, 2019, Task Force Officer (TFO) Michael Saddy conducted surveillance at 6652 N. 43rd St., Milwaukee, Wisconsin, which is GONZALEZ-COLLADO's current address according to WE Energies' records (*see* Paragraph

5

12). On both occasions, TFO Saddy observed the same silver Suzuki that GONZALEZ-COLLADO drove during the controlled cocaine purchase on January 10, 2019 (*see* Paragraph 17) parked in the driveway at 6652 N. 43rd St., Milwaukee, Wisconsin

## Controlled Purchases Involving ROSA and GONZALEZ-COLLADO

### *December 6, 2018 Controlled Purchase*

14. From December 2018 through April 2019, TFO Saddy (UC), who was acting in an undercover capacity, arranged controlled purchases of cocaine and heroin through ROSA in Milwaukee, Wisconsin. On December 6, 2018, ROSA facilitated the purchase of 3.5 grams of cocaine from an individual later identified as Wilberto SANTIAGO-MARTINEZ. While awaiting SANTIAGO-MARTINEZ, ROSA discussed his friend "Gordo" (later identified as GONZALEZ-COLLADO). ROSA said his cocaine was supplied by "Gordo," who received it from Puerto Rico. ROSA claimed he was once able to obtain between ½ and one kilogram of cocaine with little difficulty, but was unsure if he could still obtain that quantity of cocaine. ROSA said a kilogram of cocaine would cost approximately $22,000. ROSA reiterated that the cocaine would come from Puerto Rico.

### *January 10, 2019 Controlled Purchase*

15. On January 10, 2019, the UC originally arranged to purchase two ounces of cocaine from ROSA and SANTIAGO-MARTINEZ. While *en route* to the drug deal, ROSA said he was intending to cut SANTIAGO MARTINEZ out because "Gordo" (i.e., GONZALEZ-COLLADO) was returning to the business. ROSA commented that GONZALEZ-COLLADO's cocaine was better quality and that GONZALEZ-COLLADO offered more timely service than SANTIAGO-MARTINEZ. ROSA said GONZALEZ-COLLADO normally gives ROSA the cocaine prior to a deal and that ROSA would be supplying the UC for subsequent deals. ROSA

6

said the UC would be able to come into ROSA's residence where the UC could retrieve the cocaine. ROSA said GONZALEZ-COLLADO may even have ROSA deliver the cocaine directly to the UC because GONZALEZ-COLLADO liked to keep his customers happy.

16. Expressing frustration with SANTIAGO-MARTINEZ's delay, ROSA said he would take the UC to his other cocaine supplier – GONZALEZ-COLLADO. ROSA directed the UC to El Tsunami seafood restaurant, located at 2222 S. 13th Street Milwaukee, Wisconsin. ROSA said GONZALEZ-COLLADO was at the restaurant. ROSA gave the UC the choice as to whom the UC wished to conduct business: SANTIAGO-MARTINEZ or GONZALEZ-COLLADO. ROSA said GONZALEZ-COLLADO was better. ROSA said GONZALEZ-COLLADO agreed to immediately sell the UC two ounces, but that they needed to go to a home on 27th Street to pick it up. The UC agreed to purchase the cocaine from GONZALEZ-COLLADO.

17. ROSA walked inside the restaurant to confirm the new cocaine deal. Soon thereafter, GONZALEZ-COLLADO and ROSA exited the restaurant. GONZALEZ-COLLADO approached the passenger side of the UC's vehicle and greeted the UC. ROSA directed the UC to return to ROSA's residence. As the UC was driving ROSA to his residence, ROSA referred to GONZALEZ-COLLADO as "Jose," which is GONZALEZ-COLLADO's first name. ROSA remarked that GONZALEZ-COLLADO was expecting four kilograms of cocaine during the January 12th weekend. ROSA said GONZALEZ-COLLADO agreed to meet the UC at a BP gas station located at 27th Street and Saint Paul Avenue. Soon after the UC and ROSA arrived at 27th Street and Saint Paul Avenue, GONZALEZ-COLLADO arrived in a silver Suzuki, registered to Marcos APONTE, and parked directly behind the UC's vehicle. GONZALEZ-COLLADO approached the passenger side of the UC's vehicle and handed the UC a cup that

7

held a clear plastic baggie containing a white powdery substance. The UC then gave $2,600 to ROSA as payment. GONZALEZ-COLLADO directed ROSA to hold onto the money. After the deal, ROSA exited the UC's vehicle and departed the scene with GONZALEZ-COLLADO. The UC thereafter drove to a pre-determined location where investigators conducted a field test on a random sample of the suspected cocaine, obtaining positive results.

*March 12, 2019 Controlled Purchase*

18.    On March 12, 2019, the UC arranged the purchase of an ounce of cocaine and 15 grams of heroin from ROSA and GONZALEZ-COLLADO. The transaction occurred near 3500 W. Burnham Avenue, Milwaukee, Wisconsin. During the transaction the UC asked ROSA when the next shipment of cocaine would arrive. ROSA subsequently made a call on his cell phone. The UC observed the screen on ROSA's phone indicated that the call was to "Gordo," which is a nickname for GONZALEZ-COLLADO. After the call, ROSA said GONZALEZ-COLLADO would let ROSA know when the next cocaine shipment would arrive. ROSA thereafter gave the UC an ounce of cocaine in exchange for $1,300 and 15 grams of heroin in exchange for $1,350. After the transaction, the UC drove to a pre-determined location where the suspected controlled substances field-tested positive for cocaine and heroin, respectively.

*March 28, 2019 Controlled Purchase*

19.    On March 28, 2019, the UC purchased approximately three ounces of cocaine and approximately 15 grams of heroin from ROSA and GONZALEZ-COLLADO. The UC contacted ROSA to arrange the drug transaction. ROSA told the UC that he was working in Chicago and that GONZALEZ-COLLADO would conduct the drug transaction. ROSA instructed the UC to meet GONZALEZ-COLLADO at the BP gas station located at 27th Street and Saint Paul Avenue. The UC contacted ROSA to inform ROSA that the UC arrived at the

8

designated location. Soon thereafter, ROSA called the UC to inform him that GONZALEZ-COLLADO was *en route*. GONZALEZ-COLLADO subsequently arrived in a black Nissan Titan and parked behind the UC's vehicle. GONZALEZ-COLLADO exited the Nissan and entered the UC vehicle. GONZALEZ-COLLADO gave the UC approximately three ounces of a white powdery substance and approximately 15 grams of a gray-brown substance. In exchange, the UC gave GONZALEZ-COLLADO $5,100. After the transaction, the UC drove to a pre-determined location where the suspected controlled substances field-tested positive for cocaine and heroin, respectively.

*April 17, 2019 Controlled Purchase*

20. On April 17, 2019, the UC purchased approximately three ounces of cocaine and approximately 20 grams of heroin from ROSA and GONZALEZ-COLLADO. The UC contacted ROSA to arrange the drug transaction. ROSA informed the UC that the price for the drugs would be $5,500 and the transaction would occur at El Rey Marketplace, 3524 West Burnham Street, Milwaukee, Wisconsin. Upon arriving at El Rey Marketplace, the UC called ROSA to inform ROSA that the UC had arrived at the designated location. During this time, surveillance units observed GONZALEZ-COLLADO driving past El Rey Marketplace on two occasions. Soon after the UC called ROSA, ROSA arrived in his vehicle and entered the UC vehicle. ROSA gave the UC approximately three ounces of a white powdery substance and approximately 20 grams of a gray-brown substance. In exchange, the UC gave ROSA $5,500. After the transaction, the UC drove to a pre-determined location where the suspected controlled substances field-tested positive for cocaine and heroin, respectively.

21. After the controlled buy, law-enforcement officers observed GONZALEZ COLLADO's vehicle at the entrance of Stadium Storage, located at 4000 W. Burnham St.,

9

Milwaukee, Wisconsin. This is the same Stadium Storage facility where GONZALEZ-COLLADO is believed to have gone following his brief trip to the East Coast between April 2 and April 7, 2019 (*see* Paragraph 29). Officers also observed ROSA's vehicle parked next to GONZALEZ-COLLADO's vehicle and a two-door sedan parked nearby with a driver watching passing traffic in what appeared to be counter-surveillance. The location information derived from the TARGET CELL PHONE at this time indicated that the device was also located at the same Stadium Storage facility. Officers observed GONZALEZ-COLLADO enter a storage unit, exit the unit a short time later, toss a bag into his vehicle's front passenger seat, and depart the location.

### Use of TARGET CELL PHONE In Relation to Delivery of Suspicious Parcels

*Suspicious Parcel Destined for ROSA's Residence – February 13, 2019*

22.     On February 13, 2019, United States Postal Inspector (USPI) Tyler Fink, while conducting routine parcel screenings at the Milwaukee Processing and Distribution Center, located a suspicious parcel addressed to "Erik ROSA" at 1336 S. Layton Blvd., Milwaukee, Wisconsin, which is ROSA's residence. The shipping label listed the recipient's contact number as 708-982-6640, which is the TARGET CELL PHONE. The shipping label indicated the parcel was sent from Christian ROSA, P.O. Box 350, Sabana Grande, P.R. 00637. A review of telephone records showed seventy-four (74) contacts between the TARGET CELL PHONE and the ROSA CELL PHONE on that day. On February 13, 2019, law-enforcement officers established surveillance at 1336 S. 27th Street, Milwaukee, Wisconsin to await the suspicious parcel's delivery. The officers, however, subsequently learned that the U.S. Postal Service had already delivered the suspicious parcel earlier that day. At approximately the same time, the officers learned that location information for the ROSA CELL PHONE revealed that the device

was near 6652 N. 43rd Street, Milwaukee, Wisconsin, which is GONZALEZ-COLLADO's residence. Location information for the TARGET CELL PHONE revealed that the device was located at GONZALEZ-COLLADO's residence. Based on this information, the officers believed ROSA had transported the suspicious parcel to GONZALEZ-COLLADO's residence.

23.     At approximately 12:50 p.m., officers observed a silver BMW SUV at GONZALEZ-COLLADO's residence. The BMW was registered to Luis A. SANCHEZ-FRANKIE, whose listed residence was 2015 S. Muskego Avenue, Milwaukee, Wisconsin. The officers also observed a Nissan Titan parked in the driveway in front of the BMW, a Lexus sedan, and a blue Toyota sedan. At approximately 1:03 p.m., GONZALEZ-COLLADO entered his residence from the garage. At approximately 1:09 p.m., the BMW departed the residence. ROSA was in the BMW's front passenger seat while another male was driving. Soon thereafter, ROSA used the ROSA CELL PHONE to contact the UC. During the call, ROSA informed the UC that "they have it all in now" with both "white and brown" (a reference to cocaine and heroin, respectively). ROSA said "they" would be willing to drive to Madison, Wisconsin (the UC's purported hometown) to meet with the UC. ROSA said they had too much product and needed to move it fast, suggesting the contents of the suspicious parcel indeed contained illegal drugs. At approximately 1:11 p.m., the Nissan Titan and the Toyota sedan departed GONZALEZ-COLLADO's residence. The Nissan Titan was registered to ROSA. The registration associated with the Toyota sedan lists GONZALEZ-COLLADO as the owner. The officers terminated surveillance of these vehicles soon thereafter.

*Suspicious Parcel Destined for "Luis Sanchez" – February 20, 2019*

24.     On February 20, 2019, USPI Fink, while conducting routine parcel screenings at the Milwaukee Processing and Distribution Center, located a suspicious parcel addressed to

11

"Luis SANCHEZ" at 2010 S. 14th St., Milwaukee, Wisconsin. The shipping label indicated the parcel was sent from Moises I. Sanchez at Urb. Vista Hermosa D-12, Anasco P.R. 00610. Luis SANCHEZ-FRANKIE is a known associate of GONZALEZ-COLLADO. At approximately 9:25 a.m., officers observed a silver BMW SUV (the same BMW registered to SANCHEZ-FRANKIE and observed at GONZALEZ-COLLADO's residence on February 13, 2019) parked across from the 2010 S. 14th Street residence. Location information for the TARGET CELL PHONE indicated the device was a few blocks away from the 2010 S. 14th Street residence. A few minutes later, location information for the TARGET CELL PHONE indicated the device was in the vicinity of a McDonald's restaurant located at 1931 S. 14th Street, Milwaukee, Wisconsin, which was a block north of the 2010 S. 14th Street residence. The officers observed an unoccupied Dodge Ram truck parked across from the McDonald's restaurant.

25. At approximately 10:39 a.m., officers observed a U.S. Postal carrier leave a package on the porch of the 2010 S. 14th Street residence. Approximately ten minutes later, the BMW parked several houses south of the 2010 S. 14th Street residence. SANCHEZ-FRANKIE exited the BMW, picked up the package left on the porch of the 2010 S. 14th Street residence, and returned to the BMW. The BMW drove to a Burger King restaurant, located at 1841 S. 14th Street, Milwaukee, Wisconsin, where the Dodge Ram had also parked. SANCHEZ-FRANKIE exited the BMW with the package, walked over to the Dodge Ram, and gave the package to GONZALEZ-COLLADO, who officers observed in the Dodge Ram. SANCHEZ FRANKIE returned to the BMW and departed the location.

26. At approximately 11:02 a.m., location information for the TARGET CELL PHONE indicated the device was in the vicinity of the Golden Domes Apartment Complex, which is located on the corner of S. 6th Street and West Lapham Blvd., Milwaukee, Wisconsin.

12

Daisy Marie VELEZ-COLLET, a friend of SANTIAGO-MARTINEZ, resided at this complex. Approximately 15 minutes later, officers found the Dodge Ram parked at the apartment complex. At approximately 12:18 p.m., officers observed GONZALEZ-COLLADO carrying a white bag while walking with an unknown male into the underground garage of the apartment complex. GONZALEZ-COLLADO placed the white bag inside the Dodge Ram. The unknown male approached a maroon Chevrolet Trail Blazer that had just entered the garage. After speaking with the occupant of the Trail Blazer for a short time, the unknown male walked away. The Dodge Ram, driven by GONZALEZ-COLLADO, and the Trail Blazer then departed the apartment complex in tandem. The officers discontinued surveillance of GONZALEZ-COLLADO after he appeared to be conducting counter-surveillance.

### Use of TARGET CELL PHONE In Relation to Mailing of Suspected Drug Proceeds

27.     On February 19, 2019, location information for the TARGET CELL PHONE indicated the device was at a U.S. Post Office on the north side of Milwaukee. USPI Fink obtained video surveillance and still images from the postal facility, which showed GONZALEZ-COLLADO and an unknown male sending an overnight parcel to Puerto Rico. Suspecting GONZALEZ-COLLADO had mailed drug proceeds, the officers notified HSI and the Postal Inspection Service in Puerto Rico. On February 22, 2019, location information for the TARGET CELL PHONE indicated the device was again at the postal facility on the north side of Milwaukee. Video surveillance and still images showed GONZALEZ-COLLADO and Roberto SOSA (GONZALEZ-COLLADO's brother in-law) requesting a refund for the overnight parcel sent to Puerto Rico on February 19, 2019. Also on February 22, 2019, U.S. Postal inspectors in Puerto Rico obtained a warrant to search the contents of the suspect parcel. The parcel contained over $72,000 in U.S. currency.

13

## Use of TARGET CELL PHONE In Relation to Trips to the East Coast

28.     On April 2, 2019, based on location information derived from the TARGET CELL PHONE, GONZALEZ-COLLADO is believed to have driven from Milwaukee, Wisconsin to the east coast.  On April 3, 2019, GONZALEZ-COLLADO spent the night in North Lima, Ohio.  GONZALEZ-COLLADO then drove to Schenectady, New York, where he arrived early on April 4, 2019.  Later that morning, GONZALEZ-COLLADO drove to Brooklyn, New York where he spent a portion of the day before driving to Patterson, New Jersey where he spent the night.  On April 5, 2019, GONZALEZ-COLLADO drove to Vineland, New Jersey and then drove back to Schenectady, New York, arriving in the early morning hours of April 6, 2019. Later in the morning of April 6, 2019, GONZALEZ-COLLADO drove to Glenville, New York, before travelling to Erie, Pennsylvania where he spent the night.

29.     On April 7, 2019, GONZALEZ-COLLADO drove from Erie, Pennsylvania to Stadium Storage in Milwaukee, Wisconsin, where officers have previously seen GONZALEZ-COLLADO during surveillance activities, including after the April 17, 2019 undercover purchase of cocaine and heroin from ROSA. (*see* Paragraph 21)  GONZALEZ-COLLADO was at Stadium Storage for a brief time before driving to his sister's home.  GONZALEZ-COLLADO left his sister's home, went to his home for a brief time, and then drove to a hotel in Glendale, Wisconsin where he spent the night.  In the morning of April 8, 2019, GONZALEZ-COLLADO drove home where he stayed for a short time.  Soon thereafter, drove to the U.S. Post Office on Lincoln Avenue in Milwaukee, Wisconsin where he inquired about a lost parcel that law-enforcement officers later determined contained 1.8 kilograms of cocaine (*see* Paragraphs 32-36).

14

30. On May 6, 2019, according to location information derived from the TARGET CELL PHONE, GONZALEZ-COLLADO is believed to have again driven from Milwaukee, Wisconsin to the east coast. On May 6, 2019, GONZALEZ-COLLADO drove to Gary, Indiana where he spent the night. On May 7, 2019, GONZALEZ-COLLADO drove to Schenectady, New York, where he arrived in the early evening and spent the night. The next morning on May 8, 2019, GONZALEZ-COLLADO drove directly to Philadelphia, Pennsylvania where he spent the day and night. On May 9, 2019, GONZALEZ-COLLADO drove from Philadelphia to Howe, Indiana, where he arrived in the early evening and spent the night. Early the next morning on May 10, 2019, GONZALEZ-COLLADO drove to Public Storage, located at 5014 S 13th Street, Milwaukee, Wisconsin. Officers observed GONZALEZ-COLLADO meet with Marcos APONTE, who CS-2 said was responsible for shipping drug proceeds on behalf of GONZALEZ-COLLADO to co-conspirators in Puerto Rico. On May 23, 2019, APONTE mailed a parcel from Milwaukee, Wisconsin and provided a fictitious name and return address. APONTE was also the registered owner of the vehicle GONZALEZ-COLLADO drove to the controlled purchased that occurred on January 10, 2019. (*see* Paragraphs 15-17)

31. Based on your Affiant's training and experience, drug traffickers often travel, with infrequent stops, to source locations for illegal controlled substances. Upon obtaining the illegal controlled substances, these traffickers promptly return to their origin city, and occasionally locations in between, to sell the illegal controlled substances to other distributors and/or to retail-level consumers. Large east-coast cities, such as New York City and Philadelphia, are major distribution points for illegal controlled substances, including cocaine and heroin. Furthermore, based on your Affiant's training and experience, drug traffickers often travel to source cities to collect narcotics proceeds, also known as "money pick-ups," to be

15

returned to the sources-of-supply via money-wire transfer services, the U.S. Postal Service or other means.

<u>Use of the TARGET CELL PHONE In Relation to Receiving Packages of Cocaine</u>

32.     On April 8, 2019, USPI Fink was notified of a suspicious parcel, in particular, priority mail parcel with assigned tracking number 9505511454149092217758.  The parcel was 12" x 12" x 5.5" and weighed approximately 8 lbs. 14 oz.  The parcel's label indicated it was from "Emma Rodriguez," Ba Paris Calle De Pera #104, Mayaguez, Puerto Rico, 000680, and was addressed to "Jose M. Gonzalez," 5152 S 15th Street, Milwaukee, Wisconsin, 53215.  The parcel was postmarked April 2, 2019, in Mayaguez, Puerto Rico, and arrived at the West Milwaukee Post Office on April 5, 2019.  The parcel, however, could not be delivered because the destination address did not exist.  As a result, the parcel was forwarded to the Tuckaway Post Office, 5114 S. 27th Street, Milwaukee, Wisconsin. On April 8, 2019, USPI Fink reviewed surveillance video of the West Milwaukee Post Office, located at 4300 W Lincoln Avenue.  The video showed GONZALEZ-COLLADO entering the Post Office and waiting in line at about 10:52 a.m. on April 8, 2019.  While inside the Post Office, GONZALEZ-COLLADO is seen communicating with a postal employee while retrieving his cell phone.  At approximately 11:11 a.m., GONZALEZ-COLLADO is seen leaving the Post Office.

33.     After GONZALEZ-COLLADO left the Post Office, USPI Fink interviewed the postal employee who spoke with GONZALEZ-COLLADO.   The postal employee said GONZALEZ-COLLADO is a frequent customer of the West Milwaukee Post Office and prefers to speak with the postal employee because the employee speaks Spanish.  The postal employee said GONZALEZ-COLLADO was inquiring about a parcel.  When inquiring about the parcel, GONZALEZ-COLLADO gave the postal employee the parcel's tracking number, i.e.,

16

9505511454149092217758.  GONZALEZ-COLLADO also gave the postal employee the name "Jose M. Gonzalez," the telephone number (708) 982-6670, and the alternate telephone number (414) 554-4849 (the number of GONZALEZ-COLLADO's "friend"), as a means to contact him should the parcel arrive.

34.     On April 10, 2019, USPI Fink reviewed USPS customer service records to see if anyone inquired about the parcel.  On April 8, 2019, at approximately 4:30 p.m. and 9:40 p.m., an individual identifying himself as "Jose Gonzalez," with an address of 2152 S 15th Street, Milwaukee, Wisconsin, and telephone number of (708) 982-6640 (i.e., the TARGET CELL PHONE), contacted USPS customer service, provided the tracking number 9505511454149092217758, and inquired about the parcel's location and requested the issue be investigated.

35.     Investigators reviewed location information for the TARGET CELL PHONE for April 8, 2019, between 11:15 a.m. and 11:40 a.m.  Location information for the TARGET CELL PHONE revealed that it was at the West Milwaukee Post Office at approximately 11:20 a.m. – corresponding to the video surveillance of GONZALEZ-COLLADO at the West Milwaukee Post Office during that same date and time.

36.     On April 15, 2019, USPI Fink obtained a federal warrant to search the parcel assigned tracking number 9505511454149092217758.  On the same date, USPI Fink executed the warrant.  Inside the parcel, USPI Fink found a vacuum-sealed package that contained 1.8 kilograms of a white powdery substance that field-tested positive for cocaine.

<u>Review of Toll Records</u>

37.     The TARGET CELL PHONE is currently active.  Since March 18, 2019, the TARGET CELL PHONE has had over 10, 600 telephonic contacts with other telephone

17

numbers. Among those numbers with which the TARGET CELL PHONE has been in contact are numbers linked to suspected drug associates of GONZALEZ-COLLADO, including SANCHEZ-FRANKIE (*see* Paragraphs 23 et seq.), whose last recorded contact with the TARGET CELL PHONE was on May 24, 2019 SANTIAGO-MARTINEZ (*see* Paragraphs 14 et seq.), whose last recorded contact with the TARGET CELL PHONE was on May 28, 2019; APONTE (*see* Paragraphs 17 et seq.), whose last recorded contact with the TARGET CELL PHONE was on May 30, 2019; ROSA's previous cell phone, whose last recorded contact with the TARGET CELL PHONE was on May 13, 2019; and ROSA's current cell phone, whose last recorded contact with the TARGET CELL PHONE was on May 22, 2019.

38. On January 29, 2019, your Affiant obtained a Federal search warrant for information about the location (i.e., GPS data, E-911 Phase II data) of the TARGET CELL PHONE for a period of thirty (30) days. On March 22, 2019, your Affiant again obtained a Federal search warrant for information about the location (i.e., GPS data, E-911 Phase II data) of the TARGET CELL PHONE for a period of thirty (30) days. On April 24, 2019, your Affiant again obtained a Federal search warrant for information about the location (i.e., GPS data, E-911 Phase II data) of the TARGET CELL PHONE for a period of thirty (30) days.

39. Given that GONZALEZ-COLLADO, like most contemporary cell phone users, likely possesses, or has in close proximity, the TARGET CELL PHONE nearly everywhere he goes, location information for the TARGET CELL PHONE, such as E-911 Phase II data, GPS data, and latitude-longitude data, will *continue* to assist law enforcement in more precisely ascertaining his movements. By more precisely ascertaining GONZALEZ-COLLADO's movements, law enforcement officers will be better able to *continue* divining patterns from those movements, *continue* ascertaining periods of heightened activity, and thereby *continue* to more

18

effectively conduct physical surveillance. As a result, law enforcement officers will be better able to, among other things, discern GONZALEZ-COLLADO's drug distribution routes, identify confederates involved in the distribution of controlled substances, and identify locations where those controlled substances, and proceeds from the sale of those controlled substances, may be concealed.

40.     Law enforcement subpoenaed the subscriber information for the TARGET CELL PHONE which revealed the following information:

- Subscriber: NOE CONJURA
- Date range: 12/16/2018 to 01/15/2019
- Account Established Date: 10/09/2018
- Account Type: T-Mobile USA Account

41.     In my training and experience, I have learned that T-Mobile USA is a company that provides cellular communications service to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including E-911 Phase II data, also known as GPS data or latitude-longitude data and cell-site data, also known as "tower/face information" or cell tower/sector records. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not

19

necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data.

42. Based on my training and experience, I know that T-Mobile USA can collect E-911 Phase II data about the location of the TARGET CELL PHONE, including by initiating a signal to determine the location of the TARGET CELL PHONE on T-Mobile USA's network or with such other reference points as may be reasonably available.

43. Based on my training and experience, I know that T-Mobile USA can collect cell-site data on a prospective basis about the TARGET CELL PHONE. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer was connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as T-Mobile USA typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

## AUTHORIZATION REQUEST

44. Based on the foregoing, I request that the Court issue the proposed warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41. The proposed warrant will also function as a pen register order under 18 U.S.C. § 3123 authorizing the installation and use of a pen register and/or trap and trace device to record, decode, and/or capture certain information in Attachment A for each communication to or from the TARGET

CELL PHONE, without geographic limit, for a period of forty-five days (45) days pursuant to 18 U.S.C. § 3123(c)(1).

45.     I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed.  There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705.  Providing immediate notice to the subscriber or user of the TARGET CELL PHONE would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution.  *See* 18 U.S.C. § 3103a(b)(1).  As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property.  *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above.  *See* 18 U.S.C. § 3103a(b)(2).

46.     I further request that the Court direct T-Mobile USA to disclose to the government any information described in Attachment B that is within the possession, custody, or control of T-Mobile USA.  I also request that the Court direct T-Mobile USA to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with T-Mobile USA's services, including by initiating a signal to determine the location of the TARGET CELL PHONE on T-Mobile USA's network or with such other

21

reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate T-Mobile USA for reasonable expenses incurred in furnishing such facilities or assistance.

47. I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the TARGET CELL PHONE outside of daytime hours.

48. I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation, including by giving targets an opportunity to destroy or tamper with evidence, change patterns of behavior, notify confederates, and flee from prosecution.

22

# ATTACHMENT A

## Property to Be Searched

1.      The cellular telephone assigned call number (708) 982-6640, with listed subscriber NOE

CONJURA (the "TARGET CELL PHONE"), whose wireless communications service provider

is T-Mobile USA, headquartered at 4 Sylvan Way, Parsippany, New Jersey 07054.

2.      Records and information associated with the TARGET CELL PHONE that is within the

possession, custody, or control of T-Mobile USA, including information about the location of the

cellular telephone if it is subsequently assigned a different call number.

## ATTACHMENT B

## Particular Things to be Seized

### I. Information to be Disclosed by the Provider

All information about the location of the TARGET CELL PHONE described in Attachment A for a period of thirty days, during all times of day and night. "Information about the location of the TARGET CELL PHONE" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone described in Attachment A.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of T-Mobile USA, T-Mobile USA is required to disclose the Location Information to the government. In addition, T-Mobile USA must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with T-Mobile USA's services, including by initiating a signal to determine the location of the TARGET CELL PHONE on T-Mobile USA's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate T-Mobile USA for reasonable expenses incurred in furnishing such facilities or assistance.

2

This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

## II. Information to Be Seized by the Government

All information described above in Section I that constitutes evidence of violations of Title 21, United States Code, Sections 846 and 841(a)(1) (conspiracy to distribute a controlled substance and distribution of a controlled substance) involving Jose GONZALEZ-COLLADO, Eric ROSA and others.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.

3